**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**BLAKE STASSI**, on behalf of himself and all others similarly situated,

Plaintiff,

v.

**BAKER TILLY ADVISORY GROUP, LP**,

Defendant.

No.

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Blake Stassi ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Baker Tilly Advisory Group, LP ("Baker Tilly" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Defendant is a large professional services firm providing tax, financial consulting, business advisory, cybersecurity advisory, and business management services to businesses, nonprofit organizations, government agencies, and individuals.[1]

3. As such, Defendant stores a litany of highly sensitive personally identifiable information ("PII") about its current and former employees, clients, and other individuals whose information it receives in the course of its business. But Defendant lost control over that data when

[1] Baker Tilly, https://www.bakertilly.com/ (last accessed November 12, 2026).

cybercriminals infiltrated an insufficiently protected third-party platform used by Defendant in a data breach occurring on or about September 2, 2026 (the "Data Breach").

4. It is unknown for precisely how long the cybercriminals had access to the systems used to maintain Defendant's data before the breach was discovered. On information and belief, Defendant failed to implement effective means to prevent, detect, stop, or mitigate breaches of the systems on which it entrusted the Class's PII—thereby allowing cybercriminals access to that PII.

5. On information and belief, cybercriminals were able to obtain Defendant's data because Defendant failed to adequately train its employees on cybersecurity, failed to maintain reasonable security safeguards or protocols, and failed to ensure that its service providers adequately protected the Class's PII. In short, Defendant's failures placed the Class's PII in a vulnerable position—rendering it an easy target for cybercriminals.

6. Plaintiff is a former employee whose PII, on information and belief, was compromised in the Data Breach. He brings this class action on behalf of himself, and all others harmed by Defendant's misconduct.

7. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this Data Breach, the information entrusted to Defendant was private. Now, on information and belief, that private information is exposed and unsecure.

**PARTIES**

8. Plaintiff Blake Stassi is a natural person and a citizen of California. He resides in Sacramento, California, and is domiciled in California, where he intends to remain.

9. Defendant Baker Tilly Advisory Group, LP is, on information and belief, a limited partnership organized under Delaware law with its principal place of business in New York, New

York. Defendant maintains offices in Manhattan, including at 66 Hudson Boulevard East, Suite 2200, New York, New York 10001.[2]

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). On information and belief, the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs, and there are over 100 putative Class Members. Plaintiff is a citizen of California, while Defendant is a citizen of Delaware and New York for purposes of 28 U.S.C. § 1332(d)(10). The amount in controversy includes the aggregate damages and value of the equitable relief sought for the approximately 195,512 individuals affected by the Data Breach.[3]

11. This Court has personal jurisdiction over Defendant because, on information and belief, it is headquartered in New York, regularly conducts business in New York, and has sufficient minimum contacts in New York.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(1)(2) because Defendant resides and maintains its principal office in this District and, on information and belief, a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District, including the direction of the challenged data-security practices.

---

[2] Baker Tilly, Baker Tilly Announces Agreement to Acquire Anchin; New York City to Become Firm Headquarters (June 10, 2026), https://www.bakertilly.com/news/baker-tilly-announces-agreement-to-acquire-anchin; Baker Tilly, Locations, https://www.bakertilly.com/contact/offices (last accessed November 12, 2026).

[3] Under the Class Action Fairness Act, an unincorporated association is a citizen of the state where it has its principal place of business and the state under whose laws it is organized. 28 U.S.C. § 1332(d)(10). Thus, for purposes of this action, Defendant is a citizen of Delaware and New York.

## BACKGROUND

***Defendant Collected and Stored the PII of Plaintiff and the Class***

13. Defendant is one of the largest tax and business advisory firms in the United States, with more than 100 offices nationwide. Its services include tax preparation, financial consulting, cybersecurity advisory, and business management.

14. As part of its business, Defendant receives and maintains the PII of thousands of current and former employees, clients, and other individuals whose information is entrusted to it.

15. In collecting and maintaining the PII, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. Plaintiff and Class Members entrusted Defendant with their sensitive information for legitimate business and employment purposes.

16. Under state and federal law, businesses like Defendant have duties to protect their employees and clients' PII and to notify them about breaches.

17. Defendant recognizes these duties, declaring in its "Privacy Policy" that:

a. "We use a variety of safeguards to protect your Personal Information." Defendant's Privacy Policy describes physical, technical, and administrative protections, including access controls, encryption, confidentiality agreements, and training.[4]

***Defendant's Data Breach***

18. On or about September 2, 2026, cybercriminals obtained unauthorized access to information maintained for Defendant. Defendant reported that it discovered a potential

[4] Baker Tilly, Online Privacy Policy (updated June 2025), https://www.bakertilly.com/legal-and-privacy/baker-tilly-online-privacy-policy (last accessed November 12, 2026).

cybersecurity incident on September 6, 2026, involving a platform operated by a third-party service provider.[5]

19. Worryingly, Defendant admitted that an unauthorized actor obtained data relating to its clients. Defendant completed its review of the affected data on October 28, 2026.[6]

20. On information and belief, the PII compromised in the Data Breach includes:

a. Names;

b. Addresses;

c. Social Security numbers;

d. Dates of birth;

e. Driver's license information;

f. Contact information; and

g. Financial information.

21. In total, on information and belief, the Data Breach affected approximately 195,512 individuals through the exposure of their PII. The affected individuals include persons whose PII Defendant collected and maintained in connection with its business and employment relationships.

22. The precise identities of the persons injured are within Defendant's knowledge and control. Upon information and belief, the size of the putative Class can be ascertained from information in Defendant's custody and control. The putative Class includes more than one hundred members.

---

[5] Baker Tilly Advisory Group, LP, Sample Notice of Data Breach (Nov. 9, 2026), at 1–2, https://oag.ca.gov/system/files/Baker%20Tilly%20-%20Sample%20Individual%20Notice.pdf (last accessed November 12, 2026).

[6] Id.

23. And yet, Defendant did not begin issuing notices dated November 9, 2026, until 64 days after it discovered the potential incident and 68 days after the reported breach date.[7]

24. Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

25. Notably, California Civ. Code § 1798.82(a)(2)(A) mandates that notice "shall be made within 30 calendar days of discovery or notification of the data breach."

26. When Defendant issued its Notice of Data Breach, it acknowledged the need for affected individuals to protect themselves from identity theft by advising them to:

a. "remain vigilant" and review account statements and credit reports for unauthorized activity.[8]

27. Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendant caused widespread injury and damages.

28. Since the breach, Defendant claims that it took containment measures, investigated with outside experts, notified law enforcement, and took steps intended to prevent similar incidents.[9]

29. But such simple declarations are insufficient to ensure that Plaintiff's and Class Members' PII will be protected from additional exposure in a subsequent data breach.

---

[7] Id.
[8] Id.
[9] Id.

30. Further, the Notice of Data Breach does not identify the service provider or fully explain how cybercriminals obtained the affected information.[10]

31. Defendant has done little to remedy its Data Breach. True, Defendant has offered some victims two years of credit monitoring and identity-related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiff and Class Members for the injuries that Defendant inflicted upon them.[11]

32. Because of Defendant's Data Breach, the sensitive PII of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

***Cybercriminals & the Dark Web***

33. Worryingly, cybercriminals obtained sensitive information maintained for Defendant, placing that information at risk of further disclosure and misuse.

34. As explained by the global cybersecurity firm BlackFog, the *modus operandi* of cybercriminals is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[12]

35. Indeed, the Federal Trade Commission has explained that "data stolen from businesses ends up on the dark web where criminals buy and sell it to commit fraud, get fake identity documents, or fund their criminal organizations."[13]

---

[10] Id.
[11] Id.
[12] Brenda Robb, *After the Data Breach – What Happens to Your Data*, BLACKFOG (July 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.
[13] John Krebs, *The dark web: What your business needs to know*, FED. TRADE COMM. (Oct. 17, 2017) https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.

36. Thus, on information and belief, the PII of Plaintiff and the Class has already been leaked or sold by cybercriminals on the Dark Web or will be leaked or sold imminently by cybercriminals on the Dark Web.

***Plaintiff's Experiences and Injuries***

37. Plaintiff Blake Stassi is a former employee of Defendant. His employment began with Moss Adams in January 2024 and continued with Baker Tilly following the firms' combination, ending in July 2026.

38. Thus, Defendant obtained and maintained Plaintiff's PII, including his name, address, driver's license information, Social Security number, date of birth, contact information, and financial information.

39. As a result, Plaintiff was injured by Defendant's Data Breach.

40. As a condition of his employment with Defendant, Plaintiff provided Defendant with his PII. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

41. Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

42. Plaintiff reasonably understood that a portion of the funds Defendant derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

43. Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

44. Through its Data Breach, Defendant compromised Plaintiff's PII, on information and belief.

45. Plaintiff has spent time addressing the Data Breach and faces the continuing need to monitor and protect his information from misuse.

46. To address the Data Breach, Plaintiff spent approximately fifteen minutes on an intake call concerning the incident and the exposure of his information.

47. And in the aftermath of the Data Breach, beginning around mid-October 2026, Plaintiff experienced an increase in spam telephone calls concerning purported back taxes owed to the IRS and debt consolidation.

48. Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

49. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

50. As a former employee, Plaintiff suffered actual injury and lost the "benefit of the bargain" when Plaintiff provided his labor to Defendant in exchange for both payment and reasonable data security for his PII. After all, if Defendant was transparent about its deficient data security, then Plaintiff would have either (1) not worked for Defendant at all, or (2) would have required a salary premium (i.e., a "compensating wage differential") to account for the non-standard risk incurred.[14]

---

[14] Economics has long recognized that "[w]orkers choose a job and receive in return a bundle consisting of income and a probability of [] injury" and that "jobs with disagreeable characteristics command higher wages[.]" Jeff E. Biddle & Gary A. Zarkin, *Worker Preference and Market Compensation for Job Risk*, 70(4) REV. ECON. & STAT. (MIT PRESS) 660, 660–61 (1988); Robert S. Smith, *Compensating Wage Differentials and Public Policy: A Review*, 32 INDUS. & LABOR REL. REV. (CORNELL UNIV.) 339 (1979); Greg J. Duncan & Bertil Holmlund, *Was Adam Smith Right*

51. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

52. Because of the Data Breach, Plaintiff faces the need to spend considerable additional time and resources to try to mitigate his injuries and protect against misuse of his PII.

53. Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

54. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[15] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[16]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[17]

---

*After All? Another Test of the Theory of Compensating Wage Differentials*, 1 J. LABOR ECON. (UNIV. CHICAGO PRESS) 336, 336–37 (1983).

[15] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).

[16] *Id*. at 3.

[17] *Id*.

c. 89% of consumers stated that "I care about data privacy."[18]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[19]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[20]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[21]

***Plaintiff and the Proposed Class Suffered Common Injuries and Damages***

55. Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, loss of privacy, lost time, diminution in the value of their PII, and loss of the benefit of their bargain. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII is used;

b. diminution in value of their PII;

c. compromise and continuing publication of their PII;

d. out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

---

[18] *Id*. at 9.
[19] *Id*.
[20] *Id*.
[21] *Id*. at 11.

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII; and

h. continued risk to their PII—which remains in Defendant's possession—and is thus at risk for future breaches so long as Defendant fails to take appropriate measures to protect the PII.

***Substantially Increased Risk of Identity Theft and Fraud***

56. Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

57. Federal regulations define identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(b)(9).

58. Those regulations describe "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*. § 248.201(b)(8).

59. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the Dark Web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

60. The "Dark Web" is an unindexed layer of the internet that requires special software or authentication to access.[22] Criminals in particular favor the Dark Web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, Dark Web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the Dark Web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[23] This prevents Dark Web marketplaces from being easily monitored by authorities or accessed by those not in the know.

61. On information and belief, the unencrypted PII of Plaintiff and Class Members has or will end up for sale on the Dark Web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can access Plaintiff's and Class Members' PII.

62. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

63. In particular, the theft of Social Security numbers—in combination with other PII (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

64. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze

---

[22] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited July 9, 2025).
[23] *Id.*

yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[24] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[25]

65. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

66. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[26]

67. It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

68. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take

---

[24] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[25] *Id.*

[26] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

69. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

70. Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[27]

71. One example of criminals piecing together bits and pieces of compromised PII to create comprehensive dossiers on individuals is called "Fullz" packages.[28] These dossiers are both

---

[27] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[28] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer

shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

72. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. On information and belief, that is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

73. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[29]

74. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiff and the Class that their PII was stolen. Defendant's failure to promptly

---

from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

[29] *2019 Internet Crime Report* (Feb. 11, 2020) FEDERAL BUREAU OF INVESTIGATION, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

75. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

76. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

77. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

78. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

79. In 2024, 3,158 data compromises occurred, resulting in approximately 1,350,835,988 victim notices—a 211% increase in victim notices year over year.[30]

[30] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

80. Indeed, cyberattacks have become so notorious that businesses offering cybersecurity services, like Defendant, recognize the need to safeguard sensitive information and prepare for incidents.

81. In fact, Defendant itself markets services intended to protect the confidentiality, integrity, and availability of information, including third-party vendor risk management, vulnerability assessment, and cyber incident response planning.[31]

82. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Could Have Prevented the Data Breach***

83. Data breaches are preventable.[32] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[33]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[34]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . .

---

[31] Baker Tilly, Cybersecurity, https://www.bakertilly.com/services/advisory/risk-advisory/cybersecurity (last accessed November 12, 2026).
[32] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).
[33] *Id.* at 17.
[34] *Id.* at 28.

> Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[35]

***Defendant Failed to Follow FTC Guidelines***

84. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

85. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[36] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

86. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

87. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

---

[35] *Id.*

[36] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf.

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

88. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

89. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its employees and clients' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

90. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

91. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers;

monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

92. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

93. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

94. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following Nationwide Class:

> All individuals residing in the United States whose PII was compromised in the Data Breach involving Baker Tilly Advisory Group, LP occurring on or about September 2, 2026, including all those individuals who received notice of the breach.

95. Plaintiff also proposes the following California Subclass, to be represented by Plaintiff Blake Stassi:

> All individuals residing in California whose PII was compromised in the Data Breach involving Baker Tilly Advisory Group, LP occurring on or about September 2, 2026, including all those individuals who received notice of the breach.

Together, the Nationwide Class and the California Subclass are referred to as the "Class."

96. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

97. Plaintiff reserves the right to amend the class definition.

98. Plaintiff and Class Members constitute a well-defined community of interest—they are similarly situated persons and were similarly affected and damaged by the alleged conduct of Defendant.

99. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

100. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

101. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the Data Breach affected approximately 195,512 individuals, and the proposed Nationwide Class includes far more than 100 members.

102. Typicality. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

103. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class Members' interests. And Plaintiff has

retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

104. Commonality and Predominance. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class-wide proceeding can answer for all Class Members. In fact, a class-wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant was negligent in maintaining, protecting, and securing PII;

d. if Defendant breached contract promises to safeguard Plaintiff and the Class's PII;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant's Breach Notice was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, restitution, declaratory relief, and/or injunctive relief.

105. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to

the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION

**Negligence**
**(On Behalf of Plaintiff and the Class)**

106. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

107. Plaintiff and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

108. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

109. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

110. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew

or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class Members' PII.

111. Defendant owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized disclosure;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII.

112. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

113. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

114. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

115. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship

arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of obtaining services or employment from Defendant.

116. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class Members' PII.

117. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive PII.

118. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

119. Similarly, Defendant had duties under applicable state data-security laws, including California Civil Code § 1798.81.5, to use reasonable security procedures and practices appropriate to the nature of the personal information it maintained about California residents. Defendant's failure to safeguard that information constitutes negligence.

120. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

121. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members and the importance of exercising reasonable care in handling it.

122. Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

123. Defendant breached these duties as evidenced by the Data Breach.

124. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

125. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

126. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

127. Defendant has admitted that the Data Breach resulted in unauthorized acquisition of data maintained for Defendant. On information and belief, that data included the PII of Plaintiff and the Class.

128. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including the privacy injuries, lost time, lost benefit of their bargain, diminished value of their PII, and increased risk of future harm described above.

129. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

130. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION

### Negligence *per se*
### (On Behalf of Plaintiff and the Class)

131. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

132. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

133. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive PII.

134. Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

135. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

136. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

137. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

138. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

139. Similarly, Defendant violated the reasonable-security obligations imposed by California Civil Code § 1798.81.5 as to Plaintiff and California Subclass Members. The statute protects California residents against unauthorized access, disclosure, and misuse of the same types of personal information compromised here.

140. Defendant's statutory violations and its failure to comply with applicable laws constitute negligence *per se* and, alternatively, evidence of its negligence.

141. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## THIRD CAUSE OF ACTION

### Breach of Implied Contract
### (On Behalf of Plaintiff and the Class)

142. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

143. Plaintiff and Class Members directly contracted with Defendant for services or employment that included the reasonable protection of the PII necessarily provided in connection with those relationships. To the extent Class Members' information was provided through their employers or other agents, those Class Members were intended beneficiaries of the agreements to safeguard the information provided for their benefit.

144. Plaintiff and Class Members were required to provide their PII to Defendant as a condition of receiving services or employment provided by Defendant. Plaintiff and Class Members provided their PII to Defendant or its agents in exchange for those services or employment.

145. Plaintiff and Class Members reasonably understood that a portion of the funds they paid to Defendant, or that Defendant derived from their labor, would be used to pay for adequate cybersecurity measures.

146. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

147. Plaintiff and the Class Members accepted Defendant's offers by disclosing their PII to Defendant or its third-party agents in exchange for services or employment.

148. In turn, and through internal policies, Defendant agreed to protect and not disclose the PII to unauthorized persons.

149. In its Privacy Policy, Defendant represented that it used safeguards to protect personal information, including physical, technical, and administrative measures.

150. Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

151. After all, Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

152. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

153. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

154. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

155. Defendant materially breached the contracts it entered with Plaintiff and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into the systems used to maintain their information;

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII that Defendant created, received, maintained, and transmitted.

156. In these and other ways, Defendant violated its duty of good faith and fair dealing.

157. Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

158. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

159. Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

## FOURTH CAUSE OF ACTION

**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

160. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

161. This claim is pleaded in the alternative to the breach of implied contract claim.

162. Plaintiff and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their PII to provide services or facilitate employment, and (2) accepting payment or using their labor to derive profit.

163. Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

164. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

165. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

166. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

167. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and Class Members' (1) PII and (2) labor or payments because Defendant failed to adequately protect their PII.

168. Plaintiff and Class Members have no adequate remedy at law.

169. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

## FIFTH CAUSE OF ACTION

**Breach of Confidence**
**(On Behalf of Plaintiff and the Class)**

170. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

171. Plaintiff and Class Members disclosed their highly sensitive PII to Defendant in confidence—with the implicit and explicit understanding that Defendant would collect, store, and protect their PII (and *not* allow the disclosure of their PII to unauthorized third parties).

172. As such, by obtaining (and continuing to maintain) Plaintiff's and Class Members' PII, Defendant assumed an obligation to maintain the confidentiality of that PII.

173. At all times during the relationship between Defendant and Plaintiff and Class Members, Defendant was fully aware of the highly confidential nature of Plaintiff's and Class Members' PII.

174. Thus, Defendant intentionally, knowingly, and/or negligently committed the tort of breach of confidence by, *inter alia*:

a. failing to sufficiently encrypt or otherwise protect Plaintiff's and Class Members' PII;

b. failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period;

c. and via the numerous instances of misconduct detailed *supra*.

175. As a direct and proximate result of Defendant's breach of confidence, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## SIXTH CAUSE OF ACTION

**Violation of California's Unfair Competition Law (UCL)**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
**(On Behalf of Plaintiff and the California Subclass)**

176. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

177. Defendant engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. which prohibits unlawful, unfair, or fraudulent business acts or practices ("UCL").

178. Defendant's conduct is unlawful because it violates the independent data-security duties imposed by California Civil Code § 1798.81.5, the breach-notification duties imposed by California Civil Code § 1798.82, and other applicable data-security laws.

179. Defendant stored the PII of Plaintiff and the California Subclass in systems used in its business and knew or should have known it did not employ reasonable, industry-standard, and appropriate security measures that would have kept that PII secure to prevent its loss or misuse.

180. Defendant failed to disclose to Plaintiff and the California Subclass that their PII was not secure. However, Plaintiff and the California Subclass were entitled to assume, and did assume, that Defendant had secured their PII. At no time were Plaintiff and the California Subclass on notice that their PII was not secure, which Defendant had a duty to disclose.

181. Had Defendant complied with these requirements, Plaintiff and the California Subclass would not have suffered the damages related to the Data Breach.

182. Defendant's acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of, inter alia, Section 5(a) of the Federal Trade Commission Act.

183. Defendant's conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

184. Defendant's conduct is an unfair business practice under the UCL because it was immoral, unethical, oppressive, and unscrupulous and caused substantial harm. This conduct includes employing unreasonable and inadequate data security despite its business model of actively collecting PII.

185. Defendant also engaged in unfair business practices under the "tethering test." Defendant's actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

186. Instead, Defendant made the PII of Plaintiff and the California Subclass accessible to scammers, identity thieves, and other malicious actors, subjecting Plaintiff and the California Subclass to an impending risk of identity theft. Additionally, Defendant's conduct was unfair under the UCL because it violated the policies underlying the laws set out in the prior paragraph.

187. As a result of those unlawful and unfair business practices, Plaintiff and the California Subclass suffered injury-in-fact and lost money or property, including the value of their PII and the portion of the value conferred through their labor or payments that should have been used to provide reasonable data security.

188. For one, on information and belief, Plaintiff's and the California Subclass's stolen PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

189. The injuries to Plaintiff and the California Subclass greatly outweigh any alleged countervailing benefit to consumers or competition under all of the circumstances.

190. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misconduct alleged in this complaint.

191. Therefore, Plaintiff and the California Subclass are entitled to equitable relief, including restitution of the benefits Defendant obtained at their expense; a permanent injunction enjoining Defendant's unlawful and unfair business activities; and any other equitable relief the Court deems proper. These remedies are sought in the alternative to legal remedies to the extent those remedies do not fully restore the benefits wrongfully retained or prevent future injury.

## SEVENTH CAUSE OF ACTION

**Violations of the California Consumer Privacy Act ("CCPA")**
**Cal. Civ. Code § 1798.150**
**(On Behalf of Plaintiff and the California Subclass)**

192. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

193. Plaintiff and California Subclass Members are California residents and consumers within the meaning of California Civil Code § 1798.140. Their PII includes names in combination with Social Security numbers and other information protected by California Civil Code § 1798.81.5(d)(1)(A).

194. Defendant violated California Civil Code § 1798.150 by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiff's and the California Subclass's nonencrypted and nonredacted PII. As a direct and proximate result, that PII was subject to unauthorized access and exfiltration, theft, or disclosure.

195. Defendant is a business within the meaning of California Civil Code § 1798.140(d). It operates for profit, collects and determines the purposes and means of processing consumers' personal information, does business in California, and, on information and belief, exceeds the applicable annual gross-revenue threshold, as adjusted under California Civil Code § 1798.199.95.

196. Plaintiff and California Subclass Members seek injunctive and declaratory relief under California Civil Code § 1798.150(a)(1)(B) to require Defendant to safeguard their PII through reasonable security procedures and practices. Such relief is particularly important because, on information and belief, Defendant continues to hold their PII and has failed to adequately safeguard it.

197. Plaintiff reserves the right to amend this Complaint to seek statutory damages after satisfying the notice requirements of California Civil Code § 1798.150(b).

198. As described herein, an actual controversy has arisen and now exists as to whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of the information so as to protect the personal information under the CCPA.

199. A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant.

## EIGHTH CAUSE OF ACTION

### Declaratory Judgment
### (On Behalf of Plaintiff and the Class)

200. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

201. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

202. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

203. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to notify impacted individuals of the Data Breach under applicable common law and state data-breach notification requirements;

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to protect the data entrusted to it; and

d. Defendant's breaches of its duties caused—and continue to cause—injuries to Plaintiff and Class Members.

204. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

205. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

206. And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class Members' injuries.

207. If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

208. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

**PRAYER FOR RELIEF**

Plaintiff and Class Members respectfully request judgment against Defendant and that the Court enter an order:

a. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

b. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

c. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

d. Enjoining Defendant from further unfair and/or deceptive practices;

e. Awarding Plaintiff and the Class damages including compensatory, exemplary, punitive, and statutory damages as permitted by applicable law, with statutory damages under the CCPA reserved pending satisfaction of its notice requirements;

f. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

g. Awarding attorneys' fees and costs, as allowed by law;

h. Awarding prejudgment and post-judgment interest, as provided by law;

i. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

j. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

Date: November 12, 2026

Respectfully submitted,

By: */s/ Leanna A. Loginov*

Leanna A. Loginov (NY Bar No. 5894753)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel.: (305) 479-2299
lloginov@shamisgentile.com

Samuel J. Strauss*
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com
**Pro hac vice forthcoming*
*Attorneys for Plaintiff and Proposed Class*